All right, the next set of cases on our calendar this morning are two cases to be heard in a consolidated fashion. Numbers 203366 Community Housing Improvement versus City of New York and number 21-476-7474 Pinehurst versus State of New York. I gather that Council have worked out a plan which we appreciate for an orderly presentation and that Mr. Pincus will go first for community housing in number 203366 and then we'll hear from Mr. King in 74 Pinehurst, we'll then hear from the State Appellees, and then the City Appellees, the Intervenor Appellees, and then rebuttal from Mr. Pincus and Mr. King. Does that sound right, everyone? Yes. All right. Very good. Then, Mr. Pincus. Thank you, Your Honor, and may it please the court. The complaint here plausibly alleges that the rent stabilization law violates the federal constitution in multiple ways and I'd like to begin with the physical taking claim. When the tenant's lease expires and the property owner wants to stop renting the property to residential tenants, but the tenant wishes to renew, the RSL virtually always forces the owner to grant a renewal. That compelled occupation over the owner's objection deprives the owner of her right to exclude and therefore constitutes a physical taking. That the RSL has some limited exceptions to its renewal obligation doesn't matter. There is a physical taking if, at the end of the lease, an owner who wishes to stop renting her property to residential tenants is prevented by the RSL from exercising her right to exclude them. And that follows directly from Cedar Point, in which the Supreme Court held that government interference with the right to exclude constitutes a physical taking. And the court in Cedar Point said there was a physical taking because, and I quote, the regulation appropriates for the enjoyment of third parties, the owner's right to exclude. And that's exactly what the RSL does here. It appropriates for tenants. What happens, what happens when the rental ends, when the renewal, what is it that you say that they must do now that they couldn't, that they, that is different in the 2019 from what was before, that amounts to an incapacity on the part of the landlord to do anything else with the property? Your Honor, we're not challenging, our challenge doesn't focus exclusively on the changes brought by the 2019 law. We think the 2019 law combined with prior, with the, with the law that existed beforehand, the current law today, which includes both of those things. That's really my first question about whether you are complaining about the changes or whether you are complaining about the whole thing. But I'm then, I'm always put to say, why was what was before constitutional and what is done now not constitutional? Yes, in our position is what was before, certainly with respect to the physical taking part of our claims was not constitutional and that Cedar Point demonstrates that because the court in Cedar Point. But, but the previous rent control things were always affirmed by courts. They were never, never struck down. Well, they were, they were. I'm not saying that rent control is a good thing. I'm not saying that the Supreme Court might not, having changed its views, decide that all sorts of things that were constitutional seeming before or not. I'm saying I'm a court of appeals, and I'm bound by what I read the Supreme Court to have done in the past. And the fact that they may be going someplace else, and that I may agree with that doesn't allow me to go there. Justice Scalia has made that very clear that I got to wait for them. Well, I guess two responses to that. First of all, of course, this court is bound by Cedar Point, and those prior decisions of this court that you refer to, Harmon, for example, were pre-Cedar Point and applied a view of physical takings that a permanent occupation was required that the Supreme Court squarely rejected in Cedar Point. So I think this court has to look at the law based on Cedar Point. And also, I would point the court to the Supreme Court's decision in Yee, which we think confirms that a physical taking occurs here. Mr. Pincus, Cedar Point was an interesting development, but it occurred in a very different situation where we have farmers, had agricultural workers with whom they had an employment relationship, and the regulation required the owners to allow third parties, labor organizers, to come on the property for an extended period of time during the course of the year. Here, in a rent control situation, we have owners of property who are in the business of having tenants, those third parties, on their properties. That's their business model. And they have an established relationship with those people. This doesn't require them to have third parties with whom they have no relationship at all, government regulators or labor organizers, what have you, strangers, to come on their property. I see the taking as quite different in this circumstance. And actually, is Cedar Point not really controlling at all? This is a sui generis kind of relationship that has long been subject to challenge and has long been upheld, both in the physical takings challenges and regulatory challenges. Why does Cedar Point erase all of that? Well, I think Cedar Point actually, the intrusion on the right to exclude there was much more limited, three hours a day for 120 days a year. Cedar Point says something very important about timing. It says that timing is maybe different from what people thought. There's no doubt that Cedar Point does that. But how does Cedar Point in any way change the notion that somebody who was your tenant, whom you had a relation with, and could be able to stay beyond a certain amount of time as against outsiders? There are any number of cases not going as far because of the timing issue as Cedar Point, which say you cannot force somebody to have a third party outsider come in. But why do those change what may be quite wrong, but the traditional notion of what all these cases said about rental cases? Because I think the critical difference here is our physical taking claim relates to property owners who want to stop being in the residential rental business at the end of the lease. And that's why Cedar Point is relevant, but it's also relevant why the Supreme Court's decision in Yee is relevant. If I may, that was a case involving rent regulation. Do these people have to rent? That is, they can leave it vacant, can't they? No, that is the critical point here. No, no. I know they may not be able to change the nature of the rental, but do they have to rent? Well, first of all, they do have to renew the lease, except in very, very narrow circumstances. Well, except in... So they have to continue... I'm sorry, Ron? No, and previously to this, there were other circumstances. I mean, what has happened in rental is really quite remarkable because sometimes the restrictions were very, very great in the 1970s. And then in between, they became much looser, and now they've gone back to being very, very great. But how does that change the fact that there were always restrictions and there are always some things that the landlord can do? Not much, but something. If I can just discuss the Supreme Court's decision in Yee, because I think it really supplies a critical additional point here. That was a case involving rental of mobile home pads. There was a physical takings challenge to that. The court in rejecting the claim said, and I quote, What relief are you seeking? What do you want us to... If you win, what do you want us to say? On the physical taking claim, which we're talking about now, we're seeking a declaration that the obligation that when a property owner wishes to remove the property from the residential rental market for demolition, for renovation, for use for other purposes, that the obligation that he offer a renewal is unconstitutional. It's what you're asking us to do, to declare this regime on a takings basis unconstitutional? Yes, we're asking, again, we're talking about the physical taking claim. We're asking for a declaration, the precise relief that the plaintiffs in Cedar Point asked for, and that the court said was proper, and that even Justice Breyer's defense said was proper. This would apply to the million or so, whatever the number is, rent-stabilized apartments across the city? This would apply to the rent-stabilized apartments that are regulated, not the ones that took on rent stabilization obligations as a result of getting tax payments or whatever. It applies to those that are regulated without the owner agreeing to the regulation. Can you give us an indication about how many such apartments there are in the city? That's about 85% of the approximately 966,000 apartments, but every landlord is not going to want to remove the property from rental. What we're saying is, to the extent a property owner wishes to do so, the RSL is unconstitutional to the extent it prevents... Mr. Pincus, Mr. Pincus, and we're going to keep you past your time and be a little relaxed about the time. You've made a facial challenge to the whole issue. You've asked for declaratory injunctive relief against enforcing the whole rent stabilization laws, I understand it. And yet you're saying that virtually always there's no off-ramp and you're focusing your argument right now on someone who wants to no longer be in the business. But that is a very narrow subset of the other applications to people who do want to stay in the business and who complain about other aspects of how the rent stabilization law works. I don't understand how this is consistent. Are you saying that Cedar Point compels the conclusion that this rent stabilization law works with physical taking and therefore the whole rent stabilization law, you plausibly alleged that, that it's facially unconstitutional. How are those positions consistent? Because the relief we're seeking is different on different claims. We have a physical taking claim and we have a regulatory taking claim. We're talking now about the physical taking claim. But let's say you went on everything. Assume you went on everything. What do you want the credal paragraph of our opinion to say? If we went on everything, then the relief we are seeking is a declaration that the RSL is unconstitutional. And presumably then the legislature, as we say in our complaint, the legislature will go back and enact provisions that is complied with the constitution. Is there any difference with respect to what you're saying, depending on what is required for a facial taking in this? Or does it, essentially your argument is the same, whether it's a First Amendment type facial claim or this type? You know, there are various languages that have been used with respect to what constitutes a facial claim. But you're saying it doesn't really matter. It meets any one of them. Yeah, yes. And just to elaborate on that, because Judge Carney asked about the facial nature of our claim. The Supreme Court in the Patel case said the question on a facial claim is whether it is both the challenge law is unconstitutional with respect to the group for whom the law is a restriction. It's irrelevant. The group for whom the law is irrelevant doesn't matter. So that was a facial challenge to a Fourth Amendment challenge to a statute authorizing warrantless searches. And the city of Los Angeles said no facial challenge permissible because in some circumstances, a search wouldn't be unconstitutional because the property owner would consent or there might be an exigent circumstances. And Justice Sotomayor writing for the court said no. You focus on the situations where the law actually authorizes or prohibits conduct, which is why our claim here, again, focusing on the physical taking claim, is that if the relevant category, the property owners who are restricted are the property owners who wish to not renew a lease because they wish to devote the property Let's go back to that. What can an owner do who does not wish to renew a lease? Must the lease be renewed in every circumstance? A lease must be renewed unless the incumbent tenant has engaged in lease violations or illegal conduct. There is an exception where if the property owner does not have any occupied for his own use any property within the building, he may possibly regain one unit only by showing an immediate Are we talking about this with respect to individual units or the whole building? Well, the physical taking claim, both claims we're talking about with respect to individual units, because that is what the government is regulating. That is what the government is requiring the owner to give up her right. How is this different from rules that existed before loosening up between 1970 and today? Well, the background rule, property law rule, is when an owner may recapture the property. There were rent stabilization rules that controlled what you did on renewal and what you couldn't do after renewal. Long. I mean, they go back forever. It's one of the absurdities of rent control that they're put in in time of crisis and then they continue and continue and continue. But what was there that then was released or made easier and now has gone back that is so different from what is now? Well, your Honor, we again, our claim is not distinguishing. We're not saying that the 2019 amendments made a difference with respect to the physical taking. So essentially what you are saying is that this is not that different from what used to be and was upheld, but we should view it differently because of what the Supreme Court did in a very narrow context dealing with farm workers. Well, that's essentially what you're doing. I guess I would say two things in response to that, if I may. First of all, I don't believe it was a narrow context. I think it was a fundamental change. It may be that the Supreme Court is going elsewhere, but we were told specifically by Justice Scalia, and this has been re-emphasized, that just because the Supreme Court is moving in a different direction, we don't go there. It's up to them to do it. We stay with things as they were. I may well agree with what the Supreme Court was doing last year. I may well think they're going there, but that doesn't give me the right to ignore what was the law before, unless it's directly in point. I think Your Honor would be correct if there were a Supreme Court precedent that compelled the conclusion that the law is valid, but this is the opposite. As I said, the Yee case, which predated Cedar Point, which is not really discussed in this court's prior physical takings decisions, specifically distinguished in rejecting a physical taking claim the very situation we're relying on here, and said, we're not saying that our holding of no physical taking applies in that context, and the court pretty clearly indicated that there would be a physical taking in that context. I guess my problem is this. Do I try to find a way, as you as a good lawyer are trying to find a way, to say that maybe there is something before that we can squeeze in so that we can see where the Supreme Court is going and going there? Or is my job as a judge, in all honesty, to look at what the law really looked like before and say, is there anything that has been changed in that in the Supreme Court? Or do I follow what was before and let the Supreme Court make additional changes? It really has to do with whether my job is to find a way around to do something that I may want to do, or whether my job is to say, look, in all honesty, we all know what that law was. We all know what that law was. And that if they want to change it and properly change it for the better, it's up to them to do it. That's really my, you know, I'm being very blunt about that. I understand, Your Honor, but I think the critical, I think the court is certainly obligated to take account of what the Supreme Court held in Cedar Point and look at its prior decisions with reference to that. And if the court does that, I think it will see that its prior decisions rested on the notion that to have a physical taking, you required a permanent occupation. That's what the dissenters said in Cedar Point. That is what the Supreme Court squarely rejected. And so I think the basis for the court's prior decisions, which were basically that and the notion that because an owner bought after the regulation, there was some prohibition on raising or limitation on raising a physical taking claim, which the court squarely rejected in another recent decision, Horn, with respect to property. And physical takings. I think the court is obligated to look at its prior decisions. And if those decisions rest on a principle that the Supreme Court is squarely rejected, which I think the court will see that it does, that they do, then I think the court has an obligation to go back and look at the law. All right. Thank you very much, Mr. We will hear now from Mr. King. Good morning, Your Honor. Mr. King, I will be flexible with you as well about timing. I appreciate that. Your Honor. Your Honor is Kevin King from 74 pioneers pellets. The physical takings claims are the heart of our case as well. So that's where I'd like to begin. We certainly agree with Mr. Pincus that Cedar Point and need govern those claims and Judge Calabrese. You don't need to go anywhere new or different outside of those two cases to rule in our favor. All you've got to do is just apply what the Supreme Court said in those two cases. What we have alleged here, Your Honors, is that the RSL, as amended in 2019, vitiates owners right to exclude and transfers that right to tenants. Our case is, however, a little different than the one you just heard in the sense that our challenge is to the entire RSL, but only as it was amended in 2019 and not as it existed prior to that date. And you're making both, excuse me, you're making both the facial challenge as well as in certain circumstances and as applied challenge, right? Yes, that's correct, Your Honor. And that is another difference between our case and the one you just heard. So what standard do you believe needs to be met in order for you to establish a facially unconstitutional statute? Your Honor, we agree with everything Mr. Pink has said about that. The Supreme Court said in Citizens United that a facial challenge is not really a pleading standard. It just goes to the relief that would be provided. But in any event, we've argued that the plainly legitimate sweep case, plainly legitimate sweep test is the one that would apply here. Is it a little hard to say that a regime that's been in place for over 50 years has a plainly illegitimate sweep? No, Your Honor, because this regime has not been in place for over 50 years. It's been in place for not even two years. The basic elements of it, you know, whether they're off ramps for property owners to get out of the business of renting or to occupy their own premises or who successors are, all of those, the basic elements of that have been in place for a very long time. There have been some additions and tweaks since 2019, but still, you know, you have to show that it's unconstitutional in all its applications. It doesn't have a plainly legitimate sweep. And yes, there have been some modifications and how exactly that is expressed, but that's a tall order. And we've expressed a strong lack of enthusiasm for facial invalidity claims, haven't we, as in Copeland, for example. Well, Your Honor, really, our foundation here is what the Supreme Court said last summer in Bonta, which, of course, is controlling precedent here. And what they said in that case is that the normal test is either Salerno, which is no set of circumstances, or as here, no plainly legitimate sweep. And I guess the more important point from our perspective, Your Honor, is that what happened to the 2019 amendments is not just a continuation or a minor tweak to what was before. What is it that happened in 2019? I see you're answering my question to Mr. Pincus, which was, are you claiming that what happened in 2019 was the taking? So what happened in 2019? What changes were made that constitute on their face either a physical or a regulatory take? What is it that happened then that changed from what the law was before, and I don't mean immediately before, but sometime before, and what happened then that constituted a take? Certainly, Your Honor. The thing that changed is that owners no longer have the right to exercise, no longer have the ability to exercise their right to exclude at all times. Why do you say that? They don't need, I mean, you know, they can tear the building down. They can fail for it. I mean, these are expensive. They're not nice. But how is it that they can, why is that a lack of exclusion in a different way when you're dealing with third parties, of course, as in last year's case? Your Honor, all the way up until 2019, owners always had the ability to reclaim units for their own or their family's use as a resident. They had decontrol provisions. Now they can do it with respect to one apartment, but not with respect to all. And how does that constitute, I mean, you know, the fact that you're only limited to getting in for your own use is a great limitation. But the difference between using that in one apartment and more is not that great a difference, is it? Well, as to all of the apartments other than the one, those are categorically ineligible for owner recovery. So there is no way to get them back. There is no way with respect to those apartments to exercise the right to exclude. And as Mr. Pincus said, the RSL compels these lease renewals. And so it doesn't regulate, after 2019, it doesn't regulate the landlord-tenant relationship. What it does is it mandates the existence of such a relationship where it otherwise would not exist. And I guess I want to emphasize that our plaintiffs here have alleged on an as-applied basis that these off-ramps, Judge Calabresi, that you're referring to, do not apply in their circumstances. And as a result, we fall... They have not sought hardship exemptions or tried to find an off-ramp, have they? Your Honor, the hard... Because of the rightness problem? Your Honor, there are no hardship exemptions for physical taking. There is no mechanism in the statute whatsoever that could restore, for example, the owner's ability to reclaim a second, a third, or a fifth apartment for owner use. There is, likewise, no other mechanism in the statute to deal with the other elements of physical occupation that we're talking about. Those hardship exemptions, instead, apply only to the amount of money that can be charged each month for rent, and therefore are, in our view, irrelevant to physical takings analysis. If you prevail on a facial claim, what then becomes the legal status of these million leases in place throughout the suit? Your Honor, those million leases would remain, and it would be up to the owners and the tenants to negotiate a renewal if that's what they wanted to do. The owners simply wouldn't be compelled to renew the leases the way they are right now. I also want to get, Judge Carney, to something you were asking about, and the notion that these owners have voluntarily opened their buildings up, their apartments up, to occupation by third parties. That certainly means that the initial occupation might be characterized as voluntary, but because of this compelled renewal provision that we're talking about, those renewal terms are not voluntary, at least where, as here, the owners do not wish to renew the leases. But there always were limits on non-renewals. They've changed. These are much stricter than there were before, but there always were those. And when a landlord went into this in New York, knowing that there were these limits on non-renewal, wasn't that exactly opening themselves up to a change in these, which might be worse or might not? Two responses to that, Your Honor. First, no, it's not true, just as a factual matter, that it was impossible in the past to exercise the right to exclude. On the contrary, there always, always was a way for owners to regain control and use of their property, and that no longer is the case. That's a fundamental shift, and you don't have to take it from there. What was that difference, other than the limited number of apartments that you could use for your personal use, as against now? Because, you know, realistically, how many apartments could one use for one's personal use? Well, it really matters. I mean, take, for example, the Panagoulis plaintiffs here. They own a small building in Long Island City that has six rent-stabilized apartments. Let me just point out that now we're talking an as-applied challenge, right? And I think Judge Calabresi is trying to address, or I'm interested in this question, insofar as it implies still facial invalidity, which was your first position. Certainly, Your Honor. So as to the facial claim, you know, owners had various mechanisms. For example, prior to 2019, they had the decontrol provisions that allowed them, by investing in their own apartments, to go out and exercise their right to exclude. They had that ability. And, moreover, I think, you know, what the Supreme Court said in the Horne case is that this acquiescence theory, Judge Calabresi, that seems to be embedded in your question, is no longer valid. The raisin growers in that case— In Horne, they required the transfer of possession of actual raisins. Here we're talking about limits on what happens to property that is designated as residential property that is available to the public for leasing. Your Honor, two points there. First off, again, I really want to focus on the terms of the invitation. The owners here invite these tenants in for, under the RSL, at most a two-year lease term. The defendants overlook that limitation entirely, and they seem to say that if you invite someone over to watch the Super Bowl, the law gives that person the right to— That has been true from the very beginning. The change is, what you've been pointing to, is that previously this was subject to my being able to take it over in any number of different apartments for my personal use, and now that it is limited to one. But that doesn't go to whether there were limits to what I could do before. And you're saying it's a 2019 change that is unconstitutional on its face, aren't you? Yes, we're saying that the law, as amended in 2019, is unconstitutional on its face. We agree with Mr. Pincus on that score. Were the previous ones constitutional? You know, we have not made any claim about prior iterations of the statute, and we haven't briefed that, and I honestly don't have a view on that today. Mr. Pincus' case is different than ours in that regard. But just to come back to the point about— It seems to me that what you're essentially complaining about is not so much a sea change in regime, it's just a change in some of the regulatory features. No, Your Honor, and you don't have to take it from me. The sponsors of the 2019 amendments described their changes as sweeping, as the most protective in history. Look, if we go to what people say in legislature when we're passing things in order to get votes, we can go, you know— I think we've been taught not to do that. The question is, what does this actually do? And it does a lot. I'm not denying that. On the other hand, the difference between my being able to take over one apartment for my personal use and my being able to take how many? Can I take 50 apartments for my personal use? I mean, come on now. That's absurd. Your Honor, it's not just about personal use. It's about the full range of things that owners could do to regain control of their property and to exercise their right to exclude. So I don't want to get too focused on owner use. That's just one example. But as to what the 2019 amendments achieved, if you don't want to look at the legislative history, I certainly will understand. I clerked for Justice Scalia. He didn't want to look at it either. But take the New York Court of Appeals, which is the state's highest court, and its word is authoritative. And what they said in the Regina Metropolitan case is that this law adopted sweeping changes and represented a clear rejection of prior enforcement policy. Prior to 2019, the statute said it was designed to foster a transition from regulation to free market. That policy has been rejected. There is no more free market here. The most interesting thing in this case is the state of the other side is can you actually say, landlords, you must pay for something we want to do for the benefit of the poor, rather than having the whole society pay for it. But that, which was Justice Scalia's dramatic statement in dissent. It was in dissent, and I may agree with it, but it was in dissent. Your Honor, that was in dissent on a regulatory takings claim. And, again, the heart of our case is the physical takings claim. And on that point, the RSL, as amended in 2019, compels property owners to endure continued tenancies. Let me ask you a question about your as-applied physical takings challenge. Do you allege that any of the as-applied plaintiffs were forced to enter the rental market or presently have a desire or intention to exit the rental market altogether? We do not allege that any of them were forced to enter the rental market. We allege that all of them were forced to renew leases over their objection. But that isn't the second part of my question. So they weren't forced to enter it, and you're saying they do or do not have presently a desire to exit the rental market altogether? Yes. For example, the Pantagoulias plaintiffs would very much like to use… They do want to exit the rental market altogether? What they want to do, the Pantagoulias plaintiffs, Your Honor, have alleged that they would like, for example, to have Maria Pantagoulias move back into the building. But they can't do that because of the 2019 amendments. So they intend to keep renting out. They would like to keep renting out. During the meeting. Who rents in what apartments in the building. Is that right? Your Honor, there's not an allegation one way or the other about what they intend to do in the future. Isn't it up to them to say that they want to get out of the rental market altogether and are not able to do so if you're making a facial claim? But as you're saying, there's no allegation one way or another. But if the claim is that they are prevented, that there is a taking because they are prevented from doing something they want to do and have a constitutional right to do, then don't they have to tell us that that is so? Well, again, Your Honor, two responses there. In Horn, the Supreme Court did not require an allegation that the owner would change the use of the property. That let them sell line defense was rejected there. So it should be rejected here as well. But in any event, I just want to make clear that the appellants have alleged on an as applied basis here that they do want to do something else with their property. They want to occupy it. They want to leave it vacant. They want to renovate it. They want to do any number of things. They just said she was considering and they you know, there was nothing special about one unit over another unit. It was a very vague allegation. Is that really the allegation of pages 51 to 52 of the joint appendix that she's interested in moving back into the building and that she's unable to do so during the meeting. And moreover, they have alleged that, you know, where their building is located is not zoned for commercial use. So that's not an option. If you look at 61 to 62, they have said that there are any number of other things that they would. When you're saying that, aren't you getting very close to an argument about zoning? I mean, aren't you getting very close to saying that means that zoning is being limited? And by the way, haven't the panacopolis waived their as applied argument? Isn't that one of the things that originally the district court granted them? And then they said no. So that's not before. Absolutely not, Your Honor. What they did is they voluntarily dismissed their as applied. Well, then we can't have your argument that because of that, there is an applied taking here because as to them, that just doesn't know. Your Honor, that's not correct. They they waived their as applied regulatory taking challenge. They have preserved and continue to press their as applied physical takings challenge. That is still very much before the court. All right. So thank you very much. You have reserved three minutes for rebuttal, I think. Right. So we'll we'll move on and hear from the state. Ms. Murducava. Good morning. May I please record Esther Murducava for the state appellees. The appellants seek to invalidate in its entirety a comprehensive statutory scheme that is designed to provide stability in New York City's low housing market. Appellant's constitutional challenges are largely foreclosed by a well-settled precedent, and this court should affirm the dismissal of both complaints. Unless the court has specific questions about the sovereign immunity arguments related to some of the claims in the Pinehurst case, I'll move on to the physical taking claims. And all of those, both the facial challenges and as applied challenges, fail really for the same fundamental reason, which is that none of the landlords subject to the RSL was conscripted into the rental market. Yee and this court's subsequent precedents, which directly rely on yee, hold that there is no physical taking when a landlord voluntarily offers their housing to third party tenants because the hallmark of a physical taking is a compelled physical occupation or appropriation. Suppose somebody enters the rental market and a law then is passed that forever, with no limitations, with nothing of any sort, that person has never the right to get that apartment back. Would that be okay? Your Honor, if there were truly no exit ramps from the rental market, that would be it. Yeah, but you're now making a somewhat different, I mean, when you began, you seem to say that because somebody enters into the rental market, that is the end of the game, that anything can be done to that person, whether by way of regulation or by physical taking, because they have assumed that when they went into the rental market. Now, is that what you're saying? Or are you saying that the changes that have occurred here are not that dramatically different from what there were before? And therefore, they're all right. I just want to be clear on that because your opening statement was rather dramatic. And I'm happy to clarify that, Your Honor. We are not saying that a landlord who enters the market has acquiesced to the physical taking. What we're saying is that when a landlord is a voluntary participant in the rental market, the regulation of the landlord-tenant relationship that results from that economic participation is not a physical taking. Now, there is a lot of discussion in the brief about exit ramps, and I do want to distinguish between exit ramps from rent regulation and exit ramps from the rental market altogether. For the physical takings claim, the only relevant exit ramps are exit ramps from the rental market. To the extent any of the appellants wish to exit rent regulation, all they're really arguing is that they wish to continue to provide their units for rent, but not be subject to the rental controls of the RSL or other provisions that limit what they can do with respect to tenants. That does not state a physical taking claim. With respect to the exit ramps from the rental market, on the face of the law, there are a number of exit ramps. A landlord can occupy as many vacant units as they wish. A landlord can sell the entire building outright to one buyer or multiple buyers. A landlord can convert the building to condominiums or co-ops. It can convert it to commercial use for their own business. It can reclaim one unit for personal use. What Yi says is that the availability of those exit ramps on the face of the statute or regulation forecloses a spatial physical takings claim. The same arguments that the appellants are raising here, which is the arguments that those exit ramps are illusory or unavailable, they're supported by purely speculative allegations, but they're not sufficient in any event. What the Supreme Court made clear in Yi is an owner actually has to try to run that gauntlet, has to make an effort to exercise the exit ramps out of the rental market. If they're not able to do so, then maybe they can bring an as-applied claim, but that's not the situation we have here. Could you address the effect of Cedar Point? Because we've been talking about dated law in some respects, and from counsel's argument, it sounds as though they believe Cedar Point changed everything. Certainly, Your Honor. We do not think that Cedar Point changed the relevant law here, which is Yi's holding that regulations of the landlord-tenant relationship are not physical takings because what they are is a regulation of the economic relationship that is created when a landlord opens their property for occupation by third-party tenants. I think Cedar Point supports that because Cedar Point distinguishes the Pruneyard decision, which held that regulations about a shopping mall's relationship with people who enter the shopping mall are not physical takings because a shopping mall opens its property to the public. The regulations of that corresponding relationship are not physical takings because what you're really regulating is a service that's being offered to the public. Cedar Point emphasized the importance of the right to exclude and attached a new sense of priority to the landowner's right to exclude. The 2019 alterations to the rent stabilization law in New York placed great, great constraints on landowners' right to exclude. Why doesn't Cedar Point establish that they have gone too far? I think what Cedar Point talks about is the right to exclude unwanted third parties who never had the right to be there and who the landlord never authorized to be there. Here, a landlord has offered their property for rent to third-party tenants. With respect to the renewal leases that Mr. Pinkham- That is, are the changes that were made in 2019 of the same order that we have held do not violate a right to exclude? Or are they something that go to the point where that is not so? And is that so in a facial challenge or in a supply challenge in some of these cases? Well, the specific right to exclude arguments that the appellants have raised are objections to the lease renewal provisions, to the succession right provisions, and so forth. And those really aren't about the right to exclude. Those are about the landlord wanting to offer possibly leases to somebody else. None of the plaintiffs here actually allege that when they were required to give lease renewals, that they wanted to exit the rental market. I think that's actually a very notable aspect of the Pine Hearth complaint is that even the plaintiffs there that bring as supply challenges do not assert that they actually wish to exit the rental market entirely. What they are asking for is the ability to give leases to other tenants that pay more, that pay market rent. They really want to eliminate the cap on rent, because otherwise there should be no objection to giving lease renewals to a tenant that is complying with the provisions of the lease. And if the objection is really that they don't want to give lease renewals on a regulated basis pursuant to the provisions of the rent stabilization law, that does not state a physical taking claim either facially or as applied. Let me throw at you something much broader and more fundamental. If the original notion of the takings clause was that we want to do something that is for the benefit, for a public use, that benefits any number of people, we all must pay for it. Not just the people who happen to own the land that is being taken for a park or for highway or something of that sort. And isn't what is going on in the New York rent control law now exactly that? That is, we want to benefit the poor, but we don't want to pay for it. We want to make the landlord pay for it. Now, that is not the way these takings clauses have been interpreted over the years. But if that is what the fundamental notion of a takings clause is, shouldn't we then read what has happened in takings cases, including more recent Supreme Court cases like last year's case, to be, to allow us to go further in saying these laws can't be. You see what I'm saying? That if the purpose is one which we have undercut over the years, shouldn't we find ways of supporting that purpose in recent Supreme Court case? I think, Your Honor, implicit in your question and maybe some of your questions to appellant counsel is that to do so would require this court setting aside numerous prior decisions of the Second Circuit and disregarding. That was my main question to opposing counsel. And they said, oh, you're a lawyer. Be clever. You can read around them. So to be clear, I do think that that would require setting aside many prior decisions of this court, as well as disregarding the Supreme Court's direct holding in ye. And I don't think that is within the authority of this panel to do, but I will answer your question on the merits as well. I think there are a lot of assumptions about the nature of New York's rent stabilization law in that question that are not necessarily correct. The law is not intended to give benefits to any particular party or place burdens on any particular party. The law is written in response to, was written in response to, a severe housing shortage that was resulting in wildly spiking rents that was then triggering all sorts of other public harms, including homelessness, the displacement of tenants, the displacement of important community services. And that is what the legislature was seeking to address. It was seeking to regulate this landlord-tenant relationship in order to preserve a whole host, prevent a whole host of public harms, and to provide benefits to both tenants and to landlords in that regulation. And those circumstances continue to happen here today. I think even landlords would be hard-pressed to argue that they do not benefit from the rent stabilization law to the extent that it prevents a homelessness crisis, which would greatly deplete property values across the city, among other types of harm. I may briefly address that. I see that I'm over. We're being relaxed about the time, and I would like to very much to, I hope you're going to address the standard of review on a facial challenge, what we, what rule we should apply. Certainly, Your Honor. Our position is that you should apply the Salerno rule, which is that a facial, a facial challenge must, requires a showing that the law is unconstitutional in all applications. Even if you apply, even if you apply what the standard the appellants wish you to apply, which is the plainly legitimate sleep standard, we would still survive scrutiny under that standard. The rent stabilization law, which is challenged here again in its entirety, has a plainly legitimate sleep. It regulates the landlord-tenant relationship in some ways that are unique to New York law and in other ways that are present in the landlord-tenant regulations that are present throughout the country. And what about the language from Casey and Patel that was cited to us about the relative class? What would you be looking at if that standard applies? Well, I think the large fraction standard in Casey is really a sui generis standard that is applicable to abortion regulations because of the unique nature of abortion regulations. I'm not aware of any case that has applied the large fraction standard specifically outside the abortion context. With respect to Patel, I think our position is entirely consistent with what Patel said, which is that you look to the body of landlords that would be affected by the particular regulation or change. Would you take the position that if we bought the Casey standard, it still would be the case that it hasn't been met here? I would take that position, Your Honor, for a number of reasons. One is that the law on its face provides a number of exit ramps from the rental market, and the plaintiffs have to actually try to exercise those exit ramps rather than say, just throw up their hands and say, we think they're illusory, they're not available to us. That is not a way to satisfy the Titan standard for facial constitutional challenges. Under your theory, I'm not clear how an effective landlord has any remedy at all. Well, I think it depends on the nature of the landlord's injury. If there is a landlord who wishes to exit the rental market altogether, again, there are numerous exit paths that are available to them. If that landlord tries to exercise those exit paths and finds that they are unavailable or denied, then there is the possibility of an as-applied challenge that that landlord could bring. So you're saying that any landlord could theoretically, on an ad hoc basis, challenge particular features of the new regime? That's right, Your Honor. And that really is the way constitutional challenges typically are litigated. I think what is remarkable about these cases is that there are challenges seeking to set aside a very comprehensive statutory scheme that does a lot of things by noting particular provisions that the appellants object to. And we have responses to why those particular provisions do not state takings violations. But the remedy that both appellants have asked for, and I would urge us to look at pages 144 to 145 of the CHIP appendix and 121 to 122 of the Pinehurst appendix, is to enjoin the application of the rent stabilization law in its entirety. Your understanding is that what your opponents are looking for is essentially the removal of the rent stabilization law from the books and an inability of the city to apply. That is exactly the relief that they've asked for. And if the court looks at those pages of the complaint, which are the prayers for relief, the relief is to remove the application of this law in its entirety. And that kind of remedy is simply improper. So if I'm a landlord then or a tenant, and my lease is up for renewal in June, and this law is off the books, what happens? I think what Mr. King indicated would happen is that the landlord and the tenant would then be free to negotiate the lease. But I think what that really means is that if the law was truly enjoined, the landlord would be able to charge whatever rent they want to charge, and that tenant would have to take it or leave it. Would the landlord be, in those circumstances, obligated even to tender a new lease? No, Your Honor. A renewal lease? No, Your Honor, the landlord would not be because, again, the remedy that is being sought is an injunction against the application of the whole law. So that would include the lease renewal provisions. So really what would happen, and this is actually testimony that the legislature heard directly during hearings about the 2019 amendments, is that if this law were removed from the books, thousands, thousands of families in New York City would be driven directly into the shelter system. So the argument that we could decide in your favor simply on the basis that the remedy sought was broader than what any unconstitutionality of any part of this law might do, and that since the remedy sought is so broad, we deny that remedy, and if they wanted to try to bring narrower cases, they should do so in the future. Would that satisfy you? Certainly, Your Honor. We're not arguing that there can be no conceivable as-applied challenge to the statute or to provisions of the statute that are actually affecting harms on any given landlord. All right. Thank you, Your Honor. Thank you very much for your argument. We will hear from the city. Mr. Platton. Thank you, Your Honor. May it please the Court, Claude Platton on behalf of the city at the lease. Rent stabilization law has been a mainstay of life in New York City for half a century, protecting tenants from unreasonable rent increases, enabling them to put down roots, and fostering neighborhood stability. Today, 2 million city residents receive its protections, and this Court has rightly rejected past attempts to hold that the RSL affects the taking or violates due process, and it should reject plaintiff's challenges here and affirm the judgment of the district court dismissing the two suits. I'd like to just make a couple of points about the physical taking claims, which have been the focus of the conversation. I'd also like to address the regulatory taking claims in case the Court has questions about those. Just on the issue about the requirement to issue renewal leases to issue releases to successors, I think the Court's rightly recognizing these questions, that there's controlling law on this point and that indications in the Supreme Court, which I can address and my colleague has addressed about Cedar Point, don't make those decisions any less binding. I just want to highlight one point in addition about the arguments that the plaintiffs are making about the requirement to renew a lease to be a physical taking, and that's just to note that in addressing this issue in Yee, the Supreme Court, and talking about how the requirement to accept tenants one doesn't like doesn't constitute a physical invasion. Once the landlord is in the business and it's accepting tenants onto its property, that the removal of the choice to choose the identity of the tenant isn't a physical taking. I think it's significant that the Court cited as one of the examples of that principle, the Heart of Atlanta Motel case, which is, of course, the case of holding the Civil Rights Act against a taking challenge. Primarily, it was a commerce clause challenge, but there was also a taking challenge that the requirement not to discriminate in the provision of public accommodation was a taking, and the Court rejected that out of hand. In both Yee and then again in Cedar Point, the Court cited Heart of Atlanta Motel as an example of a use restriction that didn't constitute a physical taking. I just wanted to flag the point that I think the plaintiffs have a real line drawing problem if their argument, and I've heard them both say this, that the requirement to renew a lease for a tenant one doesn't like or the limitations on the ability to choose the tenant will constitute a physical taking. Counsel, you're making a distinction that Cedar Point might be making between outsiders and people who are tenants. Somebody else could say that the previous distinctions which were made all went to tenants one didn't like, went to tenants to protect anti-discrimination, all of those, and said that is not an exclusion. But why is the line to be drawn between third parties and people one had dealt with and not a line which said there are any number of reasons why making you deal with some tenants is not a taking, but other reasons instead would be a taking? That is, you may not throw out tenants because you don't like them, but you may have a right to throw out tenants if you want to use the property yourself or if you want to do something else. That is, where in the previous cases is the line that you are drawing as against the line which would say 2019 went further than anything else that was before? Well, a couple of things to say on that, Your Honor. One is this isn't a situation where the law doesn't permit exclusion of a tenant who either breaches the lease or acting properly in the unit. I think you could consider that a different case if the law didn't allow eviction of a breaching tenant, but that's not what we're talking about here. We're talking about the choice between satisfactory tenants who pay the rent, who follow the rules, and the objection that the landlord wants the ability to choose between tenants. I think that's a significantly different situation. I also just want to say that the character of this per se physical taking, and I'll get to the regulatory taking, but the character of this per se physical taking is the compulsion to have tenants on the property. And it's really not about the identity of the tenant. It's the idea that having opened the property to tenants, as these plaintiffs did, there's an inability to remove tenants and to change the use of the property. As my colleague explained, there are multiple avenues under the statute to change the use of the property. So we're not in a compulsion situation. You're saying that, realistically, what is going on is not exclusion of tenants at all, but whether you have a right to raise the rent to the tenants, whom you'd be perfectly happy to have, but you're not excluding any, compelled to have anybody there. You're compelled to charge them less than you want. And that that's a mistake, and the whole rest is just a misreading of what these statutes are. I think that's exactly what's going on here, Your Honor. And as my colleague pointed out, there's no allegation that any of these plaintiffs actually wants to leave the rental business. The objection has to be that while staying in the business, the inability to charge market rents constitutes a taking, and it just can't be cognizable as a physical taking. Mr. Plotin, what about the Pantagoulases, who allege they've been unable to recover a unit for their own personal use in the building? They can't convert the building to commercial use because of zoning restrictions, and they've been forced, because of these restrictions, to offer a renewal lease to a tenant who they didn't want to have. They didn't want to have that be a rental property. Isn't that state a plausible, as implied, taking claim? No, it doesn't, Your Honor. I mean, for one reason, which I think you noted in your questions to the Plaintiffs' Council, the allegation is really not that there's a family member waiting in the wings to take one of those units and is prohibited from doing so. The wording is pretty deliberate, I think, that this family member has considered using a unit for moving into the building, but it doesn't say that she actually would. So I think that is significant. But also, to be a physical taking, this is my point about the compulsion, it's not enough to say that there's one particular use of the property is limited. They would have to allege that there's no ability to change the use of that unit, and they haven't alleged that other options may not be available to change the use. Your claim also, partly, to the extent that this is not able to be used in other ways, is a zoning restriction. And therefore, what we look to is when zoning is valid or not. That is, that really, they're complaining about zoning. I agree. They could use it for doing any number of other things. And zoning, again, if you want to look at the original meaning of the taking clause, zoning may be very doubtful, but we have upheld zoning, which has taken up to 90% of the value. Right. I think that's right, Judge Calabresi, that there are background restrictions of many different types in New York City that limit the use of the property. They're not part of the rent stabilization law. And it's well understood that those kinds of restrictions on use are not physical takings. And I think the same logic applies to some of the complaints that the plaintiffs have made about the limit, the strictures of some of the provisions about changing the use of the property. You know, the complaint about the limitation of personal use, retaking a second unit for personal use. Those two are properly conceived, not whether they could be validly challenged, but they're properly conceived of at most as regulatory taking challenges. Because the argument really is that a particular limitation on a particular use of the property goes too far. And we know that that's conceived of through the framework of regulatory takings, and it has no place in a physical taking challenge. With regard to regulatory takings and the as-applied challenges, 74 Pinehurst and 141 Wadsworth allege that these new restrictions since 2019 have reduced the value of the buildings they own by 20 to 40% in very kind of specific ways, that they have been unable to recover costs for significant improvements in the building, and they had reasonable expectations otherwise, even given the presence of the rent control or rent stabilization regime before. Isn't that enough to satisfy Penn Central in terms of regulatory takings, at least to make it a plausible allegation that gets them to be able to move on to summary judgment? It's not, Your Honor. So I'll take each of the pieces in turn. The allegation that the buildings lost 20 to 40% of their value registers, I guess I would say, very weakly on the economic impact factor. This Court has noted that their cases have been, or takings have not been found, where up to 90% of the value of a property has been removed. This is nothing approaching that. Excuse me just a second, but we're looking at that still in the context of just a substantial economic impact is required by Penn Central. And then you looked at their reasonable investment expectations, as well as the character of the use. So I'm not sure that it's fair to take it kind of one factor alone. I mean, certainly if it's 40%, that's a substantial impact. Wouldn't you agree? It's substantial. I guess my point is, of course, it's a multi-factor test, and you weigh the factors against each other. But this is nowhere near the magnitude of an impact that this Court has recognized would constitute a substantial diminution in the value of property. So I'm not saying that there's some sort of hard cutoff. What I'm saying is that the economic impact weighs very weakly. You mentioned there's a major capital improvement that one of the plaintiffs made, I believe. Let me just ask, to the extent that we're talking about regulatory taking, how relevant is it that this regulation, sets of regulations, have been there for so long, and have been very stringent at some time, and less stringent at some others, and so that people who enter into this don't have the kind of expectation that would be protected under that language of Penn Central? I mean, how does that apply to the people here who are claiming an as-applied taking? Does that protect them or not? It doesn't, and thank you for that. The District Court, I think, rightly noted that these two plaintiffs who bring in the as-applied challenges purchased in the early to mid-2000s, after the rent stabilization law was substantially in the form that it's in now. As your Honor noted, the original statute was more stringent. It underwent some changes over time that made it more landlord-friendly, adding deregulated control provisions and various other ways to increase rents, and then it swung the other way. Your argument would be that whatever these financial impacts now, they're ones that these people, given when they bought and what happened afterwards, should have expected, and so they are not the kind of impacts that Penn Central was talking about. Yes, that's exactly right. We'll hear maybe. We haven't heard anything, but we'll hear maybe from the other side about that, but we haven't heard anything so far. We have the briefs, but we haven't heard an oral argument. Assuming that they are going to return to that question, let me put a little more meat on the bones there. Anyone purchasing 30 years into the history of the rent stabilization law would have noticed that it was a subject of repeated legislative attention and amendment, that the legislature was always revisiting it in response to economic changes, and that would be baked into their expectations. In response to economic changes or simply in response to political changes? Who happened to have control of the legislature at that moment? Maybe those two, but that, again, is part of the expectations any reasonable owner would have. I just want to address the idea that the 2019 changes were dramatic. In many respects, they rolled back changes that had been added in the 1990s, early 2000s. Preferential rents were added in 2003. The decontrolled provisions that removed units from regulation were added in the 1990s. These weren't innovations. They were just the legislature readjusting the dial, having gone one way, going back to the other. The legislature had done something quite similar in 2011 and 2015, adjusting some of the same provisions. A landlord's expectations would have to incorporate the idea that there would be subsequent changes, including these two plaintiffs who have the as-applied claims, and the 2019 amendments didn't do anything more that was then changed in matters of degree. Were changes of the same sort gone back and forth with respect to being able to take over the apartment for personal use or not? Now, I know that that's being argued as a physical taking, and so it's a different thing, but I'm kind of curious about whether that is something which was a change that went for the first time rather than one of these back-and-forth type of things. Yeah, that one hadn't been changed before, to my knowledge. You're right that they're not attempting to articulate a regulatory-taking challenge. That is going too far. These regulatory-taking challenges are really on different aspects of the scheme, but that one had not been previously altered. All right, Mr. Platton, do you want to say a last word before we move on? No, I think I'll stop there. I'll rest on my brief. Thank you, Your Honor. All right, thank you very much. We'll hear from the interveners. Good morning, Your Honor. Caitlin Halligan on behalf of Interveners, New York Tenants and Neighbors, Community Voices Heard, and Coalition for the Homeless. I'd like to make three points, if I can. First of all, with regard to the physical takings, and Judge Calabresi, your exchange with Mr. Pinkett with regard to Cedar Point, I would call the Court's attention to footnote four of the supplemental brief in which Chip argues that Cedar Point somehow undoes ye. Even Chip, in this footnote, acknowledges, and I quote, the continued viability of that aspect of ye as a question for the Supreme Court. And so it is not, as I think your exchange with Mr. Platton suggested, a question on which this Court could reach a different result. Ye does control here, and I would like to explain why. In addition to the points that my colleagues from the city and the state made, in fact, the law in California that was at issue there is strikingly similar to the law in New York. And I would call the Court's attention in particular to the provision of the California law that is referenced in ye, which is section 798.55. What that statute provided, and I'm quoting here, is that management shall not terminate or refuse to renew a tenancy except for the specified reasons. So the same renewal rights that they attack here as going too far and creating a physical taking were also at play in ye. And what the Court said in ye is that it might be a different case if the landlord is prohibited in perpetuity, has no exit ramps at all from ending the tenancy, but the restrictions on that exit option were quite similar in California as they are here. And with respect to Cedar Point, Judge Kearney, as your exchange suggested, that case is distinguishable as even, I think, Mr. Pincus is obligated to acknowledge in his footnote. Judge Calabresi, if I can respond to your question with regard to the Pinel dissent and the point that Justice Scalia makes there, I think that what you're referring to is the argument that he makes in dissent that if there is not a connection that is required between the land use at issue and the social problem that a regulation attempts to remedy, that perhaps regulations could go too far. And what the Supreme Court explains in Lingle is two things in response to that concern. The Court says, first of all, that these questions about fairness and justice are addressed by applying the Penn Central factors with regard to a regulatory takings challenge. And secondly, and this is at page 542 in Lingle, what the Court says in Lingle is that the inquiry about whether or not a regulation substantially advances and does so fairly a legitimate government interest, that is a question that is addressed by the due process clause. Because that is a challenge that is really probing a regulation's validity and asking whether or not it is arbitrary. The litigants here have brought due process challenges. They argue with really no defense that strict scrutiny applies. Rational review applies. And clearly, these provisions, including the 2019 amendments, are certainly well within the range of what should survive that sort of scrutiny. I really want to turn, if I can, to the impact here. And Judge Perker, you asked about this. It is clear, as my colleague, Ms. Mordechieva, points out, that if you look at the prayer for relief, they are asking this Court to enjoin the application of the RSL in its entirety. And that would have the consequences that she laid out. What that would mean very specifically, and this is set forth in the intervener's brief at page 10, and I would also draw the Court's attention to the amicus briefs on this point. Nearly a million apartments, which is 44% of the rental stock in this city, would be up for grabs. In other counties, 36,000 apartments, that would affect 2.3 million people who would be left to fend for themselves. And in addition to the number that Ms. Mordechieva cited, the record shows that 43% of the folks in family shelters are ones who have been displaced from rent-regulated apartments. If this Court were to enjoin application of the rent stabilization laws, as my adversary suggests, that number would clearly go through the ceiling, and the consequences would be catastrophic. So they certainly have not alleged anything that would allow them to proceed. But in addition, the consequences of what they're asking for would be draconian. If the Court has any questions, I'm happy to address them. Thank you. Thank you very much. Thank you. Mr. Pincus, you have several minutes to rebuttal. Thank you, Your Honor. I think my friends on the other side are confusing the critical distinction that we're trying to draw. Our physical takings claim before this Court is about conscripting owners to force them to keep units in the rental market when they want to use them themselves, use them for commercial purposes, demolish them, turn them into condos for uses, non-residential rental uses. We are not, and the footnote that Ms. Halligan referred to, we are not saying that it is a physical taking if the unit remains in the residential rental market. We are not arguing before this Court, and that's what the footnote says, that preventing the owner from choosing the tenant is a physical taking. Yee indicates that that draws that precise distinction. We're not asking this Court, for the reasons Judge Calabrese mentioned, to go beyond where the Supreme Court went in yee and where we think the Court should go. Mr. Pincus, the relief you've asked for is declaratory injunctive relief declaring the whole of the rent stabilization law unconstitutional as an official matter. Do you still want that? Is that something you want? That is not the relief we are seeking on our physical takings claim. On the other claim, is that a relief you're seeking? That is certainly the relief we seek with respect to our regulatory taking claim. Suppose you win. Let me ask you to give us your views on the consequences of that Ms. Halligan and Ms. Monica Ava presented to us. How are we to grapple with that reality? We don't believe, and we say this in the complaint, that the New York legislature will not enact a new law. It will enact a new law based on the guidelines that the courts provide about what the constitutional limits are. Why don't you ask for some small relief like saying that the right to exercise your own apartment and your own ownership for your own one can't be limited to one and that is the only thing that we are trying to strike down or something. Why don't you focus on those things which make it compulsory given that you've said that many things that make it compulsory are not? I guess I would say a couple of things. The prayer for relief in complaints are generally broad. We've not been asked to refine our prayer for relief. Clearly the case has been referred to the physical pain. It's yours. It's nobody else's. It is, Your Honor, and if we win on our broadest theory, including we have a due process claim, we believe that's the appropriate relief. On physical takings, we do have a more targeted claim. Are you telling us you're not really serious about the as-applied challenge? We don't have an as-applied challenge in our case, Your Honor. On the facial change. You're not serious about the facial challenge? We are serious about the facial challenge. The legal theory of our physical takings claim is that the RSL affects the taking to the extent it prevents an owner who wishes to leave the residence or rental. I have to interrupt. What the prayer for relief says on your complaint on JA 145 is that we enjoin the application and enforcement of the rent stabilization laws as an unlawful physical taking of private property. There's no qualification. There's no limitation. There's no subset. There's no in these particular circumstances. There's no shaping or contouring that's inconsistent with what you've just been telling us. Well, Your Honor, this was the prayer for relief in our complaint. If we prevail before the Supreme Court on the broader claim, we're not pressing here. We think that relief may well be appropriate. But I'm focusing on the relief that would be appropriate for the claim. I'm now very confused on where we are on this. Well, what is it you want us to do? Well, I mean, what we have to do is ask the district court to tell us. Council, we have what you asked us to do. You now have said maybe that's something that the Supreme Court could do. But we're not the Supreme Court. We're a lower court. And you're asking us to do something which on your very statements now goes beyond what any of the previous cases would allow us to do. So what do you want us to do? Say we don't really mean it? No, we are seeking that relief. That is the relief we believe on the broadest theory of our claim. We're focusing here on the physical taking claim and where we think the current Supreme Court jurisprudence is. And as I explained, I think on the other side have made have drawn a distinction. No, no, no, no, no, no. Your entire complaint is up here for review. Your complaint was dismissed below in 12 B6. So your notice of appeal brings it all up here. It doesn't bring it up your piecemeal. It doesn't bring up just your regulatory taking claim and not another claim. No, it brings up it brings up to us to consider in its entirety the relief you've requested. And Your Honor, I don't think it would be appropriate if the complaint states a plausible allegation of a constitutional violation. But the relief may be somewhat narrower. I don't think it would be appropriate for this court to say because the prayer for relief is broad. We throw out counsel. We throw out cases all the time brought by people who have miserable lawyers because they have asked for something which goes beyond what their complaint justifies. Well, we think our complaint is very good lawyers. Mercy, you know, this is wonderfully argued, but it's very good lawyers ask for something which is beyond what we can give. Why should we give it? Why should we say they might have asked for something else which might have saved something in a situation which is fairly complicated? Well, Your Honor, we think that our claims we are entitled to the relief. If the court disagrees, obviously, it will find the relief more limited. We believe that physical takings claim because both the area that I said I've been focusing on, which is keeping units in the rental market, is impermissible under Cedar Point. And because the compulsion to renew a lease is impermissible under Cedar Point, we're entitled to broad relief under that claim. And on the regulatory takings claim, which we haven't really talked about, we think that that is a claim that is based on all of the impositions together that the RSL imposes on property owners. So do you want the relief you seek? Yes, we do. Do you want all the relief you seek? We want all the relief we seek. As I said before, we don't believe that that will lead to the consequences Ms. Halligan hypothesized because we think the New York legislature will intervene and enact a lawful law that will deal with New York's situation, but in a way that is not unconstitutional. Entirely speculative. Who knows what, when, may happen? New York also has the option of paying compensation. Well, you want to say a word? We've been interrupting you a lot. Say the last word and then we'll finish up. Let me just say one thing. You know, in some ways, what you're suggesting is a very different approach, which is taken in Europe of saying, a court like ours saying to the legislature, look, what we have before us, we don't strike down because it goes too far. On the other hand, there are any number of problems here that are heading towards unconstitutionality. Legislature, you'd better think about it and come back. That's something we don't do much in this country, but it's something that courts in Europe do all the time. Now, that's a different kind of a holding. It says you lose now that we say something to the legislature. I guess, Your Honor, what I'm suggesting is that we win now, but the legislature will take account of that and address and react to it as legislatures often do. If I can just make two additional points. You raised the Pennell dissent. We think that is wholly applicable here, as we say in our briefs. The New York Court of Appeals specifically said this is a benefit that's targeted on specific populations that is paid for by a discrete, off the books, by a discrete group of property owners. With respect to regulatory takings, we argue it in our briefs. I'll just make one point about the question about investment backed expectations. The Supreme Court in the Palazzolo case and then in the Murr case said the fact that someone bought after a regulation was in effect does not per se invalidate their takings claim. It is a factor to be considered. And so we do not think that is a basis for dismissal of our regulatory takings claim. Thank you very much, Mr. Pincus. Okay, Mr. King. Thank you, Your Honors. A few quick points on rebuttal, and I appreciate the court's indulgence on the time. These are important issues, and they deserve the careful consideration you've been giving, so we appreciate that. I'll start with the remedy question, Judge Parker, that you were asking. You know, we're here on a motion to dismiss a 12B6. And so, really, the question from our perspective is, have we stated a claim? We believe that we have, both basically and as applied. And if you rule in our favor on that question, the only thing that will happen is that this case will go back to the district court for development of a record and either summary judgment proceedings or trial. The remedy would come later. So we think that simplifies the analysis a great deal. Second, even if the RSL is declared to be a physical taking, the government would still have every ability to regulate the amount of rent that's charged when an owner chooses to rent out a unit to a third party. That would not be affected by our physical takings claim. The thing that would be affected is that the government would not be able to do, as the RSL as amended in 2019 does, compel the owner to rent that unit when the owner doesn't want to. That's really the gravamen of our physical takings claim is you can't force us to rent when we don't want to rent. And Cedar Point fully supports our claim in that regard, as does ye. Ye says that if a law on its face or as applied compelled owners to continue renting, that's going to be a taking. And that's what we've alleged here on an as applied basis, which, by the way, the plaintiffs did not do. Look, Judge Calabrese made, I think, a very, very interesting point that there are procedures available in lots of European countries that are not available here. And I think it was foreshadowed by arguments that Mr. Pink has made that this is a case that cries out for a more sensible legislative fix. And I suppose the practical problem we face is, I think, just as an aside, we all agree that there are anomalies in this law. And like many regulatory regimes, it could be improved. It could be modified and so forth. But what's our lever to do that? And so, Your Honor, first off- Without wreaking chaos in the city. We wholeheartedly agree that there's no need to wreak chaos and that this law cries out for some targeted changes. And so if you were to agree with us on the merits, if we got to that point, on our physical takings claim, you know, one of the sort of scalpel rather than sledgehammer maneuvers that a court can take here would be to say that the compelled renewal provision is out. Or that some of the other changes, the fundamental changes adopted in 2019 are out. We are not challenging the law as it existed before May 2019. Now, there may be good arguments that that law has problems. Mr. Pincus has raised them. But we're not asserting those here. And so I think, you know, it would not be some fundamental shift to set the law back to the way it was in April of 2019, for example. And that's just one way that a court might go about addressing your question, Judge Parker. As for our as-applied physical takings claims, the Pantagoulias plaintiffs have alleged that a specific rent-stabilized apartment, the one that Maria Pantagoulias is interested in, and I'm quoting appendix page 52, which is our complaint. That specific apartment is taken, physically occupied by the 2019 amendments. There is nothing, literally nothing, the Pantagoulias plaintiffs can do, they have alleged, to get that particular apartment back. And so, you know, you can have the more abstract discussion about other apartments and bigger numbers, millions of people. But here on an as-applied claim, we're making a very specific allegation that fits hand-in-glove into the exception in Yee, which says that, you know, again, if an owner is compelled to renew over a year. You said she would move into that apartment? She said she'd like to move in, yes. She said she was considering, and she was kind of generally interested, and of course there was no allegation that she was disabled from living in the building altogether, right? It was just one particular unit she was considering. Well, in addition to saying considering, I'm just quoting here from the fourth line of paragraph 64 of our complaint. It says she's interested in living in this unit. And the fact that she could maybe live in some other unit doesn't really answer the question pointed out by Yee and Cedar Point, which is, is this particular apartment, this stabilized apartment that she'd like to live in, is it being, you know, is there a compelled occupation? And we have alleged on an as-applied basis that the answer is yes. And on that point, I do want to point out that Ms. Halligan is in error when she asserts that the purported off-ramps in the RSL are similar to the off-ramp that was dispositive in Yee. That is not correct, categorically not correct. The law in Yee gave owners an unqualified right on 12 months' notice to evict all of their tenants and put that land to a different use without relying on any action by the tenants and without any third-party approvals. And I would point you to section 798.556G2B of that California statute, which says, again, on 12 months' notice, the owner can kick everybody out and do something else with the property. That is, in fact, what the Pantagoulia plaintiffs have alleged they want to do here. As to that apartment, they want to exit the rental market. They want to use that for themselves. So we think that's a critically important difference and a reason why our as-applied claim is plausible here. All right. Thank you very much. Thank you, Your Honors. Thank you all. Thank you all. Wonderfully interesting case, well-argued, well-briefed. We are fortunate to have you all. Yes, thank you all. And the clerk will please adjourn court. That concludes our proceedings for the morning. Court is then adjourned. Thank you. I'll transfer you now, David. Thank you. You're welcome. Thank you. Thank you. Thank you. Thank you.